UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE OHIO CASUALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JAMES A. REED, LINDA LOU MULL REED, MASTERWEAR, INC., WILLIAM J. CURE, ELIZABETH J. CURE, UNITED STATES FIDELITY AND GUARANTY COMPANY, HOOSIER INSURANCE COMPANY, STATE AUTOMOBILE MUTUAL INSURANCE COMPANY, CHARLES MASON, RUBY PRUITT d/b/a RUBY'S DINER, BILLY J. CUNNINGHAM, MARY ANN  CUNNINGHAM, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT, CITY OF MARTINSVILLE, INDIANA, HOMETOWN TRANSMISSION, INC., SAMUEL and DELORES NEAL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 1:04-cv-2027-DFH-WTL |
| Defendants. | ) ) | |

ENTRY ON OHIO CASUALTY'S MOTION FOR ORDER TO DEPOSIT
INSURANCE PROCEEDS AND FOR OTHER DECLARATORY RELIEF AND ON
CERTAIN DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Ohio Casualty Insurance Company has filed this action for interpleader and

declaratory judgment to satisfy obligations for pollution-related claims against its

policyholders Masterwear, Inc. and James Reed.  Reed and his wife Linda Lou

Mull Reed owned and operated Masterwear as an industrial laundry and dry

cleaning business in downtown Martinsville, Indiana from approximately January 1986 until November 1991.

In 2004, state and federal environmental authorities identified Masterwear as the probable source of chemical contamination of the soil, groundwater, and air in an area of downtown Martinsville.  Expensive clean-up efforts began at the site.  Several neighboring persons and businesses allege that they have suffered bodily injuries and property damage from pollution caused by Masterwear.

In December 2004, Ohio Casualty filed this action naming as defendants the parties potentially liable for the contamination, their insurers, the government agencies charged with cleaning up the contamination, the City of Martinsville ("the City"), and several persons who had contacted Ohio Casualty seeking indemnification.  Ohio Casualty then filed a motion seeking to deposit the Masterwear policy proceeds with the court, minus the indemnity expenses it claims to have already paid.  See Docket No. 89.  Ohio Casualty asks the court, upon the deposit of these funds, to enjoin the defendants from demanding indemnification from it on any claims they might have against Masterwear and/or the Reeds and to dismiss it from the case with prejudice.

Several defendants oppose Ohio Casualty's motion.  Three have filed a joint motion for partial summary judgment.  See Docket No. 227 (motion filed by Pruitt, Mason, and the Cunninghams).  These defendants argue that the Masterwear

policies provide additional coverage for their claims.  They also ask the court to find as a matter of law that certain payments made by Ohio Casualty on behalf of Masterwear were not indemnity expenses, but defense costs that do not count toward the policies' liability limit.  Other defendants oppose Ohio Casualty's motion as premature as to the issue of allocating indemnity versus defense costs.

For the reasons explained below, the court concludes as a matter of law that the total liability limit of the three Ohio Casualty Masterwear policies for the claims asserted by the defendants is $1.5 million.  However, Ohio Casualty's request to deposit less than this amount must be denied.  At this stage in the litigation, the court cannot decide as a matter of law which of Ohio Casualty's paid expenses are properly designated as indemnity costs as opposed to defense costs.  Ohio Casualty should have deposited this sum with the court on December 13, 2004, when it filed its complaint in interpleader.  The court orders Ohio Casualty to deposit the $1.5 million plus interest no later than Friday, August 18, 2006.

*Facts for Summary Judgment*

Masterwear operated as an industrial dry cleaning and laundry business in downtown Martinsville, Indiana from approximately January 1986 until November 1991.  From 1988 through 1991, Masterwear had primary commercial general liability ("CGL") insurance under three policies with American Alliance Insurance Company.  Masterwear was administratively dissolved as a corporation in 1994.  In 1998, Ohio Casualty became the transferee of certain liabilities and related

assets of Great American Insurance Company, including the three Masterwear policies.[1]

At all times relevant to this litigation, James and Linda Lou Mull Reed operated the Masterwear business. The Reeds leased the Masterwear site from William and Elizabeth Cure pursuant to two separate lease agreements, one beginning in December 1985 and the second beginning on February 1, 1990. According to Ohio Casualty, these lease agreements require that Masterwear defend and indemnify the Cures and hold them harmless for any liability resulting from Masterwear's occupancy of the site.

The claimant-defendants allege that Masterwear, as part of its laundry and dry cleaning operations, improperly stored and handled large quantities of hazardous chemicals including tetrachloroethene (also known as perchloroethylene or "PCE") and trichloroethylene ("TCE"). Both PCE and TCE are listed as hazardous substances in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.* ("CERCLA"). The defendants contend that PCE is a probable human carcinogen and that TCE can cause damage to the brain, nervous system, and other organs.

_____

[1]See generally Matheny Aff. ¶ 5. Policy No. PAC 1-16-27-97 was issued in the name of "Masterwear, Inc." and was effective from November 22, 1988 to November 22, 1989. See Pl. Ex. A. Policy No. PAC 1-16-27-97-01 was issued to "Masterwear, Inc." and was effective from November 22, 1989 to November 22, 1990. See Pl. Ex. B. Policy No. PAC 2-26-09-39 was issued to "Masterwear, Inc. and James Reed" and was effective from November 22, 1990 to November 22, 1991. See Pl. Ex. C.

On April 19, 2004, the United States Environmental Protection Agency ("EPA") issued a Unilateral Administrative Order ("UAO") to James Reed and William Cure pursuant to section 106(a) of CERCLA, 42 U.S.C. § 9606(a).  See Matheny Aff. ¶ 6, Ex. D.  The Order stated that EPA had performed air sampling in late 2003 and early 2004 and had found PCE vapors in homes and businesses near the Masterwear site at a level above the Indiana Department of Environmental Management ("IDEM") "sub-chronic action" level.  Order at 3.  The Order also stated that IDEM test results showed that two of Martinsville's three public drinking wells had been affected by PCE from the Masterwear site.  One city well was closed completely as a result of the contamination.  *Id.*

The UAO holds Reed and Cure jointly and severally liable for conducting removal activities at the Masterwear site to "abate an imminent and substantial endangerment to the public health, welfare or the environment that may be presented by the actual or threatened release of hazardous substances at or from the Site."  Order at 1.  In addition to requiring compliance with a number of administrative details, the UAO specifically requires that Reed and Cure eliminate or reduce levels of PCE vapors in neighboring businesses and residences by installing vapor reduction, ventilation, or similar systems, and by performing air sampling until IDEM deems it no longer necessary.  *Id.* at 7.  The UAO also requires that Reed and Cure either remove or treat contaminated soil adjacent to the Masterwear site after determining the extent of contamination.  *Id.*  If Reed and Cure elect to treat the soil, the treatment system must be maintained until

IDEM concludes that it is no longer necessary. The Order also mandates the reimbursement of response costs incurred by EPA in overseeing the implementation of the Order's requirements. *Id.* at 12.

On June 7, 2004, counsel for Masterwear and Reed notified EPA of their irrevocable intent to comply with the UAO. See Matheny Second Aff. ¶ 6, Ex. A. Masterwear and Reed retained Astbury Environmental Engineering, Inc. ("Astbury") to conduct the activities required by the UAO and designated Fred Nichols of Astbury as the project coordinator. *Id.*

Astbury apparently prepared a Work Plan for EPA on June 21, 2004 and submitted a Remedial Work Plan to EPA and IDEM on November 12, 2004. Neither document has been made part of the record. Astbury also sent monthly status reports to EPA as required by the UAO. Status reports from July through December 2004 have been introduced into the record. See Matheny Second Aff. ¶ 5, Ex. B. Finally, some parties have indicated that in November 2004, IDEM contacted Reed to require that he investigate and address groundwater contamination threatening the City's public water supply. The court has not located this documentation in the record.

On July 22, 2004, Ohio Casualty agreed to defend and partially indemnify Reed and Masterwear under a general reservation of rights. Matheny Aff. ¶ 7. Ohio Casualty has identified defendant State Automobile Mutual Insurance

Company ("State Auto") a/k/a Meridian Insurance as the only other insurer that might have provided coverage to Masterwear during the relevant period. In addition, Ohio Casualty has notified the Cures' insurer, defendant United States Fidelity & Guaranty Company ("USF&G"), that it will participate in the defense and indemnity of the Cures based on their lease agreements with Masterwear. Matheny Aff. ¶ 8; see also Cures' Surreply Ex. A. Ohio Casualty claims that defendant Hoosier Insurance Company also insured the Cures at times relevant to this litigation. Matheny Aff. ¶ 11.

Several neighboring persons and business owners allege that they have suffered bodily injuries and property damage as a result of contamination at the Masterwear site. The City of Martinsville and the EPA seek recoupment of costs associated with the pollution. The proceeds from Ohio Casualty's three policies (and the potential proceeds from the insurer-defendants who dispute coverage) appear to be the only substantial assets available to the claimants in this dispute. There is no indication that the Reeds or the Cures have sufficient personal assets to cover the damages alleged.

Several claimant-defendants have already filed separate suits against Masterwear, the Reeds, and the Cures, and those related actions are pending in this district. See Cause Nos. 1:04-cv-1616 (suit brought by Billy J. and Mary Ann Cunningham), 1:04-cv-1994 (suit brought by City of Martinsville), and 1:05-cv-0373 (suit brought by United States). Martinsville property owner Charles Mason

and his lessee Ruby Pruitt (the owner and sole proprietor of Ruby's Diner) have filed counter-claims and cross-claims in this suit. See Pruitt Aff. ¶ 9; Mason Aff. ¶ 9. The court previously granted a request to intervene in this action by nearby business Hometown Transmission, Inc. and its owners Samuel and Delores Neal. See Docket No. 406. They have asserted similar claims.

Ohio Casualty filed this interpleader action in December 2004 and its amended complaint in February 2005. Soon thereafter, it filed its motion for order to deposit insurance proceeds and for other declaratory relief. Several defendants object to Ohio Casualty's motion, and Pruitt, Mason, and the Cunninghams have filed their own motion for partial summary judgment.

*This Court's Jurisdiction and the Scope of Requested Relief*

Before turning to the merits of the parties' motions, the court must first address a few jurisdictional points and one issue about the scope of this entry. An interpleader action may be brought in federal court under either the Federal Interpleader Act, 28 U.S.C. § 1335, or Rule 22 of the Federal Rules of Civil Procedure. Ohio Casualty claims that this action qualifies as both rule interpleader and statutory interpleader. See Br. at 7. Ohio Casualty is only partially correct. Rule 22 cannot serve as an independent basis for subject matter jurisdiction, and Ohio Casualty has not identified any statutory basis for this court to exercise jurisdiction over a rule interpleader action. See *Commercial Nat. Bank of Chicago v. Demos*, 18 F.3d 485, 488 (7th Cir. 1994), citing *General*

*Railway Signal Co. v. Corcoran*, 921 F.2d 700, 705 (7th Cir. 1991); see also *Commercial Union Ins. Co. v. United States*, 999 F.2d 581, 584 (D.C. Cir. 1993). When Ohio Casualty, an Ohio corporation, amended its complaint and named State Auto, another Ohio corporation, as a defendant to this action, the court no longer had diversity jurisdiction under 28 U.S.C. § 1332.

On the other hand, statutory interpleader under § 1335 requires only that there be diversity between at least two of the adverse claimant-defendants (and that the amount in controversy exceed $500). See *Corcoran*, 921 F.2d at 703; see also *Priority Records, Inc. v. Bridgeport Music, Inc.*, 907 F. Supp. 725, 728 & n.3 (S.D.N.Y. 1995), citing 7 Wright, Miller & Kane, *Federal Practice & Procedure* § 1703 (1986) ("rule interpleader requires complete diversity of citizenship between the stakeholder and the claimants; statutory interpleader is satisfied by minimal diversity between or among the claimants."). Minimal diversity is present in this case because, at the very least, the Cunninghams are diverse from the claimant-defendants holding Indiana citizenship. See Amended Cplt. ¶¶ 12-13.

In connection with its motion to deposit funds, Ohio Casualty requests declaratory and injunctive relief. It asks that the court restrain and enjoin all defendants from pursuing any action against it for claims against Masterwear and/or the Reeds, and that the court require the defendants to answer, interplead, and settle their claims to the insurance proceeds amongst themselves. Ohio Casualty also requests that, once it has made its deposit to the court, the

court declare that it has no further duty to indemnify any of the defendants and that it be ordered dismissed from this case with prejudice.

Ohio Casualty claims that its request for this relief is brought pursuant to 28 U.S.C. § 2202.  That provision, however, allows the court to grant additional necessary or proper relief only against a party whose rights have been determined by a declaratory judgment under § 2201.  See, *e.g.*, *Broyles v. Commercial Union Ins. Co. of New York*, 287 F. Supp. 942, 950 (W.D. Ark. 1968).  And § 2201 requires an independent basis for subject matter jurisdiction.

Ohio Casualty's request for declaratory relief is more properly brought pursuant to 28 U.S.C. § 2361, which authorizes injunctive relief in an interpleader action brought under § 1335.  Section 2361 authorizes the district court to enjoin the defendants from instituting any action affecting the disputed funds, to discharge the plaintiff from further liability, and to make all appropriate orders to enforce its judgment.  See *Corcoran*, 921 F.2d at 702-03; *Illinois Employers Ins. of Wausau v. Mihalcik*, 801 F.2d 949, 951 (7th Cir. 1986).

Finally, Ohio Casualty initially requested that the court declare that it had no further duty to defend Masterwear or the Reeds once it had paid $1,500,000 in indemnity expenses.  See Orig. Cplt. at 14.  It relied on the following language from the Masterwear policies:  "our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or

-10-

settlements . . . ."  See Section I, Coverage A, ¶ 1(a)(2).  When Ohio Casualty amended its complaint, it omitted a request that the court resolve any issues concerning its duty to defend.  See also Rep. Br. at 34.

In their surreply to Ohio Casualty's motion, the Cures insist that this issue is still on the table.  See Br. at 5-9.  They have requested – without making a formal motion – that the court not relieve Ohio Casualty of its duty to defend Masterwear and the Reeds once it has deposited funds with the court.  They point to the following testimony by Ohio Casualty claims litigation associate Paula Matheny as evidence that Ohio Casualty intends to act otherwise:  "Ohio Casualty still feels that their duty to defend is over when our limits are exhausted, and we do not feel we need a court to make that decision."  Matheny Dep. at 223.  The Cures argue that Ohio Casualty's deposit with the court should not extinguish its duty to defend because it will not have been made in the payment of "judgments or settlements," as those terms are interpreted in the case law.

Ordinarily, absent a contractual or other relationship, a third party does not have standing to argue that an insurer has a duty to defend its insureds.  See *Foreman v. Jongkind Bros., Inc.*, 625 N.E.2d 463, 469 (Ind. App. 1993).  But the Cures have an interest in seeing that Ohio Casualty continues to defend Masterwear and the Reeds, of course, because Ohio Casualty has agreed to participate in their defense based upon their lease agreements with Masterwear. Nevertheless, the court makes no findings in this entry concerning Ohio

-11-

Casualty's prospective duty to defend its insureds.  Ohio Casualty did not raise this issue as part of its motion and no other party has properly made a motion for its determination.  The Cures have not introduced into evidence either their Lease Agreements with Masterwear or their alleged agreement with Ohio Casualty to provide a defense.  If the Cures wish the court to decide this issue, they should file a separate motion and submit this evidence which is not yet before the court.[2]

---

[2]Although courts are split on the issue, the majority view appears to be that tendering funds with the court in an interpleader action does *not* discharge an insurer's defense obligations under the type of policies purchased by Masterwear. See, *e.g.*, *Utah Power & Light Co. v. Fed. Ins. Co.*, 711 F. Supp. 1544, 1550-54 (D. Utah 1989) (discussing differences in policy language and concluding that insurer's tender of policy limits to insured did not relieve it of duty to defend where policy language required exhaustion of limits through payment of judgments or settlements); see also B. Ostrager & T. Newman, *Handbook on Insurance Coverage Disputes* § 5.03[a] at 270 (12th ed. 2004) ("The cases are divided over whether an insurer, which wrote coverage on a post-1966 ISO form, can exhaust its policy limits and thereby terminate its defense obligations by tendering its policy limits into the court or to its insured.  The majority view is that an insurer cannot discharge its defense obligations by tendering its policy limits unless the policy expressly authorizes tender."); 7 Wright, Miller & Kane, *Federal Practice and Procedure* § 1713 ("an insurer, by resorting to interpleader in a federal court and depositing the proceeds of the policy with the court, should not be relieved of his contractual obligation under state law to defend the insured"); accord, *Samply v. Integrity Ins. Co.*, 476 So.2d 79, 83 (Ala. 1985) (insurer could not avoid duty to defend insured by tendering policy limits into court without settlement or insured's consent where policy stated that duty to defend ended when limit of liability for coverage had been exhausted); *Emcasco Ins. Co. v. Davis*, 753 F. Supp. 1458, 1460-61 (W.D. Ark. 1990) (same); cf. *General Casualty Co. of Wisconsin v. Whipple*, 328 F.2d 353, 357 (7th Cir. 1964) (insurer's duty to defend ceased after it tendered full policy limits with the court under pre-1966 policy that obligated insurer "as respects insurance afforded by this policy"); *Denham v. LaSalle-Madison Hotel Co.*, 168 F.2d 576, 584 (7th Cir. 1948) (same).

*The Parties' Motions*

Ohio Casualty's motion to deposit funds and the defendants' motion for partial summary judgment are essentially cross-motions for summary judgment on two issues: the total liability limit under the three Masterwear policies, and the amount that Ohio Casualty has already paid toward that limit. Summary judgment should be granted for either party only where the evidence demonstrates that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The fact that both sides have filed cross-motions does not alter this standard; the court must consider each motion independently and will deny both motions if there is a genuine issue of material fact. *E.g.*, *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993); *Harms v. Laboratory Corp. of America*, 155 F. Supp. 2d 891, 905-06 (N.D. Ill. 2001).

I.     *Total Liability Limit Under the Masterwear Policies*

    A.     *The Limits of Insurance*

The terms of the three Masterwear policies are identical in all material respects. The policies state:

> The Limits of Insurance shown in the Declarations and the rules below fix the most [Ohio Casualty] will pay regardless of the number of: (a) insureds; (b) claims made or "suits" brought; or (c) persons or organizations making claims or bringing "suits."

Section III, ¶ 1.  The Declarations Page for the General Liability Coverage Part of each policy lists the Limits of Insurance.  The Page reads in part:

| | |
|---|---|
| General Aggregate Limit (Other Than Products-Completed Operations) | $500,000 |
| Products – Completed Operations Aggregate Limit | $500,000 |
| * * * | |
| Each Occurrence Limit | $500,000 |

Under the policies, the General Aggregate Limit is the most [Ohio Casualty] will pay for the sum of:

    a.    medical expenses under Coverage C [Medical Payments]
    b.    damages under Coverage A [Bodily Injury and Property Damage Liability], *except* damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and
    c.    damages under Coverage B [Personal and Advertising Injury Liability].

Section III, ¶ 2 (emphasis added).  All parties agree that the General Aggregate Limit of $500,000 per policy period is available for the defendants' property damage and bodily injury claims.  The dispute is whether an additional $500,000 per policy period is available under the products-completed operations hazard.

The Products-Completed Operations Aggregate Limit is "the most [Ohio Casualty] will pay under Coverage A for damages because of 'bodily injury' and 'property damage' included in the 'products-completed operations hazard.'" Section III, ¶ 3.  Pruitt, Mason, and the Cunninghams contend that the separate

Products-Completed Operations Aggregate Limit also applies to their claims, creating a total limit of liability of $1 million per policy period.  They argue that this amount is not capped at $500,000 by the Each Occurrence Limit because there were multiple chemical spills and therefore multiple occurrences in each policy period.

Ohio Casualty offers several alternative arguments in response.  First, it argues that the defendants' damages do not fit within the definition of "products-completed operations hazard" or, at the very least, that they fit within one or more exceptions to the definition.  Ohio Casualty also argues that, even if products-completed operations coverage applies to the claims against its insureds, either the General Aggregate Limit or the Products-Completed Operations Aggregate Limit would be available to satisfy the defendants' claims, but not both.  Finally, Ohio Casualty contends that, even if both aggregate limits were applicable and available, the Each Occurrence Limit would cap its indemnity obligations at $500,000 per policy period.

B.    *Completed Operations Hazard Coverage*

The court need not decide all of the interpretation issues raised by the parties because the claims involved in this suit unambiguously fall outside the scope of the products-completed operations hazard coverage.

The policies define "products-completed operations hazard" as including all bodily injury and property damage occurring away from premises owned or rented by the insured and arising out of the insured's "product" or "work," except for products that are still in the physical possession of the insured or work that has not yet been completed or abandoned.  Section V, ¶ 11(a).

The undisputed facts show that the bodily injury and property damage alleged by the defendants in this case occurred away from Masterwear's premises. The defendants allege that their damages were caused by hazardous chemicals that migrated from the Masterwear site to nearby businesses and homes.

Defendants argue that their damages arose out of Masterwear's "work" because PCE and TCE were solvents used in Masterwear's laundry and dry cleaning operations.  Ohio Casualty responds that completed operations hazard coverage is intended to insure completed construction and maintenance work performed off-site by contractors and subcontractors and does not insure against the type of damages alleged here.[3]

---

[3]The defendants agree that their damages did not arise out of a Masterwear "product" as that term is used in the Ohio Casualty policies.  See Rep. Br. at 2-3. Indiana courts likely would find that accidental chemical contamination does not fit within the scope of products hazard coverage.  See *B & R Farm Services, Inc. v. Farm Bureau Mut. Ins. Co.*, 483 N.E.2d 1076, 1077 (Ind. 1985) (products hazard *exclusion* did not exclude coverage for damages resulting from insured's negligent release of liquid fertilizer into creek because insured had not placed defective good into stream of commerce, or voluntarily "relinquished" physical possession of a product as required by policy's terms).

All of the parties agree that Indiana law governs the interpretation of the policies.  The parties have not cited and the court has not located any published decisions by Indiana courts addressing generally the applicability of completed operations hazard coverage to environmental contamination stemming from the insured's operations.  Nevertheless, in light of the plain language of the policies, this court predicts that the Indiana Supreme Court would hold that the defendants' claims are not covered.

The Masterwear policies define "work" as:

(a) work or operations performed by you or on your behalf; and

(b) materials, parts or equipment furnished in connection with such work or operations.

Section V, ¶ 15.  This definition of "work" is broad enough to include Masterwear's laundry and dry cleaning operations and the chemicals used as part of those operations.

The definition of "products-completed operations hazard" itself, however, explicitly excludes damages arising out of "work that has not yet been completed or abandoned."  ¶ 11(a)(2).  The policies state that the insured's work will be deemed "completed" at the earliest of the following three times:

(1) When all of the work called for in your contract has been completed.

(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

-17-

(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

¶ 11(b).

Under Indiana law, if an insurance policy's language is clear and unambiguous, it should be given its plain and ordinary meaning. On the other hand, if the language is ambiguous, the policy should be construed in favor of the insured to further the policy's basic purpose of indemnity. See *General Accident Ins. Co. of America v. Gonzales*, 86 F.3d 673, 675 (7th Cir. 1996), citing *Tate v. Secura Insurance*, 587 N.E.2d 665, 668 (Ind. 1992); see also *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985). An ambiguity exists only if the policy's language is susceptible to more than one interpretation and reasonably intelligent persons could honestly differ about its meaning. *Gonzales*, 86 F.3d at 675, citing *Fidelity and Guaranty Ins. Underwriters, Inc. v. Everett I. Brown Co., L.P.*, 25 F.3d 484, 486 (7th Cir. 1994), citing in turn *Eli Lilly and Co.*, 482 N.E.2d at 470.

When the policy provisions relevant to completed operations hazard coverage are read together, the only reasonable interpretation is that this type of coverage does not extend to the pollution claims alleged by the defendants. First, if Masterwear's "work" were its ordinary business operations, there would be no way to make sense of the policy provision dictating when that work would be deemed "completed." That provision explicitly contemplates work performed

under a "contract," and as part of a distinct "project."  The provision's references to "another contractor or subcontractor" and "job site" also support Ohio Casualty's view that coverage is intended to apply to off-site contractor work.  See also *American Red Cross v. Travelers Indemnity Co. of Rhode Island*, 816 F. Supp. 755, 759-60 (D.D.C. 1993) ("The plain language of this provision indicates that it is intended to apply to construction and maintenance work, such as work performed on the premises of others by contractors and subcontractors."), and authorities cited therein; *Nautilus Ins. Co. v. Don's Guns & Galleries, Inc.*, 2000 WL 34251061, *4 (S.D. Ind. Jan. 26, 2000) (in deciding that completed operations hazard *exclusion* did not apply, stating that similarly-worded completed operations hazard provision "provides coverage for businesses that perform services or maintenance, such as contractors or subcontractors . . . or for injuries occurring while the insured was completing an 'operation' away from the insured's premises") (internal citations omitted).

Masterwear's "work" also could not be considered "completed" or "abandoned" in even the ordinary sense.  Ohio Casualty's policies provide coverage for bodily injury and property damage only if such damages occur during the policy periods.  See Section I, ¶ 1(b)(2).  During the relevant policy periods, Masterwear continued to operate its laundry and dry cleaning business.  It did not "complete" or "abandon" general operations until a later date.  As a matter of law, then, defendants' claims do not fall within the policy's completed operations coverage.  Accord, *Steyer v. Westvaco Corp.*, 450 F. Supp. 384, 393-94 (D. Md.

1978) (concluding as a matter of law that completed operations hazard did not cover damage caused by insured's emission of air pollution as part of its ongoing, day-to-day operation of paper mill); see also *American Home Assurance Co. v. AGM Marine Contractors, Inc.*, 379 F. Supp. 2d 134, 137 (D. Mass. 2005) (noting that products-completed operations hazard provision, "when properly construed as a subpart of the entire policy, describes coverage within the policy for the same type of injuries or damages covered by the rest of the policy, save for a different period of time"); B. Ostrager & T. Newman, *Handbook on Insurance Coverage Disputes* § 7.02[c][6] at 372-73 (12th ed. 2004) ("If the claim arose while on the premises of the insured, or while the insured performed services or operations, the claim will fall under the premises-operations coverage.  On the other hand, if the claim arose once the insured's product was relinquished into the stream of commerce, its operations are deemed completed and, therefore, the products-completed operations hazard applies.").

The defendants cite several decisions by Indiana courts that they argue demonstrate a general preference in favor of finding broad environmental liability coverage under CGL policies.  See *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37 (Ind. 2002) (summarily affirming appellate court's conclusion that *Seymour* and *Kiger* applied even where insured was not in the business of handling or using toxic or potentially polluting substances); *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049 (Ind. 2001) (holding that "owned property" exclusion did not apply to claims for off-site damages caused by environmental contamination on insured's property;

concluding that contamination could constitute a covered occurrence in multiple policy periods and that insurer was liable for all damages resulting from a covered occurrence whether or not the damaging effects extended beyond policy period); *Seymour Mfg. Co., Inc. v. Commercial Union Ins. Co.*, 665 N.E.2d 891 (Ind. 1996) (on basis of *Kiger*, insurer had duty to defend insured in suit by EPA to recover clean-up costs associated with leaking storage containers); *American States Ins. Co. v. Kiger*, 662 N.E.2d 945 (Ind. 1996) (holding that pollution exclusion and "sudden and accidental" exception to exclusion in CGL policy were ambiguous and therefore did not preclude coverage for damages caused by leakage of underground gasoline storage tanks); *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705 (Ind. App. 2004) (policy provision dictating that exposure to substantially the same general conditions would be deemed one occurrence did not require insured to prove that contaminants were actually released during each policy period but that contamination continued to cause damage in each period); *Employer Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015 (Ind. App. 1999) (applying *Dana*'s interpretation of "suit" in context of insurer's non-waiver agreement with insured); *Travelers Indemnity Co. v. Summit Corp. of America*, 715 N.E.2d 926 (Ind. App. 1999) (as a matter of first impression, CGL policy's "personal injury" provision provided coverage for environmental clean-up claims); *Hartford Accident & Indemnity Co. v. Dana Corp.*, 690 N.E.2d 285 (Ind. App. 1997) (as used in CGL policy, the term "suits" includes coercive and adversarial administrative proceedings and the term "damages" includes EPA or state-mandated clean-up and response costs); *Great Lakes Chemical Corp. v. Int'l Surplus Lines Ins. Co.*,

638 N.E.2d 847 (Ind. App. 1994) (even though damages resulting from pesticide manufactured and distributed by insured might be excluded by literal reading of pollution exclusion, CGL policy provided coverage to preserve insured's expectations of coverage for product liability claims and to prevent rendering the coverage it had purchased illusory).

Those cases did not address the specific issue of policy interpretation raised here and do not support a different coverage determination.  The defendants seem to be arguing in essence that the insured should always win in coverage disputes involving environmental contamination.  None of the cited cases eliminated the requirement under Indiana law that the court look first to the relevant policy language in deciding the scope of coverage.  *E.g.*, *Dana Corp.*, 759 N.E.2d at 1053-54 (court must start from the proposition that contracts for insurance are subject to the same rules of interpretation as other contracts and that clear and unambiguous policy language will be given its plain and ordinary meaning).

The three Masterwear policies provide up to $500,000 per policy period, or a total liability limit of $1.5 million, for the defendants' claims.  The motion by defendants Pruitt, Mason, and the Cunninghams for partial summary judgment that a higher limit is available for their claims is denied.

-22-

II.     *Allocation of Ohio Casualty's Payments – Indemnity vs. Defense Costs*

Ohio Casualty asks the court to find that it has satisfied nearly all of its $1.5 million total liability limit.  By the time it filed its reply brief, Ohio Casualty claimed to have made indemnity payments totaling $1,128,070.33 on behalf of its insureds.  It designated its payments as follows:

| | |
|---|---|
| Prior claim for Masterwear in 1991 | $      1,973.48 |
| Astbury Environmental Services | $ 1,119,934.23 |
| William Cure | $      6,162.62 |

See Matheny Second Aff. ¶ 7, Ex. C.  Ohio Casualty therefore requests that it be permitted to deposit $371,929.67 with the court as the remaining proceeds available for the defendants' claims.

Several defendants oppose Ohio Casualty's motion.  They argue that some of Ohio Casualty's payments should be designated as defense costs rather then indemnity expenses that count toward the $1.5 million liability limit.  They also argue that any allocation of expenses is premature at this point based on the evidence before the court.

A.     *Policy Language and Case Law*

The court starts, as it must, with the relevant policy language.  The Masterwear policies state that Ohio Casualty will indemnify Masterwear and/or Reed for sums they become legally obligated to pay as damages because of "bodily injury" or "property damage" to which CGL insurance applies.  Indiana courts

-23-

have held that "damages" for indemnity purposes can include environmental contamination clean-up and response costs mandated by federal or state regulators.  See *Dana*, 690 N.E.2d at 298.

The policies also state that Ohio Casualty has the right and duty to defend its insureds in any suit seeking those damages.  In addition, Ohio Casualty retains discretion to investigate any "occurrence" and to settle any claim or "suit" that may result.  Section I, Coverage A, ¶ 1.  Ohio Casualty has agreed to pay, with respect to any claim or suit it defends, among other expenses, "[a]ll *reasonable* expenses incurred by the insured at our request to assist it in the *investigation* or *defense* of the claim or 'suit.'"  Section I, Supplementary Payments – Coverages A and B (emphases added).  The policies explicitly state: "These payments will not reduce the limits of insurance."

While indemnity expenses are capped by the policies' Limits of Insurance, there is no contractual limit on the amount of defense costs Ohio Casualty may be required to pay.  As noted above, Ohio Casualty's duty to defend ends only when the applicable Limits of Insurance have been exhausted in the payment of judgments or settlements.[4]

---

[4]The timing of that event in this interpleader action has not yet been determined.  See *supra* note 2.

The difficult task comes in trying to distinguish between expenses paid by an insurer as part of its duty to indemnify the policyholder and expenses paid pursuant to its broader duty to defend. This question is particularly difficult in the context of an ongoing environmental contamination clean-up effort. The activities and expenses associated with identifying potentially responsible parties, determining the extent of the contamination, determining the extent of the insured's liability, and remediating the contaminated site may all occur simultaneously. This question is particularly important where, as here, the policy indemnity limits could be exhausted by the clean-up process alone, leaving no proceeds available for any successful personal claims against the insureds.

"Where state law provides the rule of decision, the federal courts must predict how the highest court of the state would decide the case if presented with the case today." *Klunk v. County of St. Joseph*, 170 F.3d 772, 777 (7th Cir. 1999). The parties agree that Indiana law governs, but the Indiana Supreme Court and the Indiana Court of Appeals have said very little about even the general standards for allocating insurer payments between defense costs and indemnity costs. Neither court has addressed the specific issue of how to allocate environmental clean-up costs paid by an insurer under a CGL policy.

In the absence of a decision by the state's highest court, this court may consider decisions by Indiana's lower courts and the courts of other jurisdictions, as well as other persuasive authorities. See *Stephan v. Rocky Mountain Chocolate*

*Factory, Inc.*, 129 F.3d 414, 417 (7th Cir. 1997). Courts in other jurisdictions have formulated different standards for deciding when environmental clean-up costs should be designated defense costs versus indemnity expenses. The New Jersey Supreme Court has summarized the competing policy considerations. Treating remedial investigation and feasibility study costs as indemnity expenses would tend to expedite the settlement and disposition of environmental clean-up cases, while treating such costs as defense costs would increase the overall amount of resources available for such clean-ups. *General Accident Ins. Co. of America v. N.B. Fairclough & Son, Inc.*, 672 A.2d 1154, 1161-62 (N.J. 1996) (adopting presumption that mandated costs are indemnity costs to be allocated to indemnity provisions of the policy, but allowing policyholder to show that the insurance company has derived unjust benefit from such allocation if it would relieve insurance company of an expense that it would otherwise have incurred under its obligation to defend).

In the face of these competing considerations, most courts have avoided bright lines and have relied on fact-specific determinations that give the trial court a fair amount of discretion in trying to allocate costs fairly. In addition to the *Fairclough* decision, see, *e.g.*, *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty and Surety Co.*, 177 F.3d 210, 225-26 (3rd Cir. 1999) (in light of *Fairclough*, rejecting bright-line rule, reversing trial court's allocation, and giving disadvantaged parties an opportunity to rebut presumption that costs were indemnity costs); *Aerojet-General Corp. v. Transport Indemnity Co.*, 948 P. 2d 909,

922 (Cal. 1997) (insured's site investigation expenses could constitute defense costs as long as investigation was conducted within temporal limits of insurer's duty to defend and costs amounted to "a reasonable and necessary effort to avoid or at least minimize liability"); *Domtar, Inc. v. Niagara Fire Ins. Co.*,  563 N.W.2d 724, 738 (Minn. 1997) (en banc) (certain "dual purpose" investigation and compliance costs incurred as a result of state agency's "Request for Response Action" were properly designated as defense costs because they were reasonably necessary either to defeat insured's liability or to minimize scope or magnitude of that liability); *Endicott Johnson Corp. v. Liberty Mutual Ins. Co.*, 928 F. Supp. 176, 183-84 (N.D.N.Y. 1996), *appeal dismissed,* 116 F.3d 53 (2d Cir. 1997) (noting that law was "jumbled," deciding to treat remedial investigations as defense costs and feasibility studies as indemnity costs, and applying equitable allocation for costs not easily classified); *Fireman's Fund Ins. Companies v. Ex-Cell-O Corp.*, 790 F. Supp. 1318, 1338 (E.D. Mich. 1992) ("defense costs include not only those reasonable and necessary costs to defeat or limit liability, but also those costs, including consulting fees, that are reasonable and necessary to limiting the scope and/or costs of remediation, even if similar or identical studies have been ordered by the government"); *Gelman Sciences, Inc. v. Fireman's Fund Ins. Cos.*, 455 N.W.2d 328 (Mich. App. 1990) (rejecting insured's argument that costs of installing sewers and connecting private parties to city water system after contaminating private water supply were defense costs because they were incurred voluntarily to mitigate future claims for injuries:  "defense costs are monies expended to develop and put forth a theory that the defendant is not liable

or only partially liable for the plaintiff's injuries . . . [p]reventative measures are cost effective and commendable, but in this case, they are indemnification damages not defense costs"); *Higgins Industries v. Fireman's Fund Ins. Co.*, No. 87-CV-10406 (E.D. Mich. Oct. 23, 1990) (magistrate's report and recommendation following evidentiary hearing; costs of mandated environmental studies before certain date were defense costs because they were performed primarily to determine source of groundwater contamination, while costs after such date were indemnity expenses because focus of studies had then shifted to determining appropriate means of correcting problem and preventing further migration).

Thus, the case law in this area is not readily susceptible to the development of bright-line rules, and the cases show that allocating costs is a highly fact-sensitive inquiry. The disagreement among courts on the proper legal standard to apply to the facts is only compounded in this case by the conflicting evidence about the nature and purpose of many of Ohio Casualty's expenses.

B.   *Ohio Casualty's Expenditures*

The parties' dispute focuses primarily on the categorization of payments made by Ohio Casualty to the Astbury environmental consultants. Ohio Casualty has submitted itemized invoices of Astbury's charges for the work it has performed at the Masterwear site. See Matheny Aff. ¶ 13, Ex. E; Matheny Second Aff. ¶ 7, Ex. C. The invoices divide Astbury's work into task codes and give a one or two-word description of each charge.

Astbury's monthly status reports to EPA provide more detailed information about the nature and ongoing progress of its work.  See Matheny Second Aff. ¶ 5, Ex. B.  Those reports indicate that Astbury did some up-front work to investigate the extent of contamination.  For example, Astbury installed three groundwater monitoring wells and began geoprobing to delineate the source subsurface soil. Astbury also initiated a vapor intrusion air canister sampling program to substantiate the EPA's tested levels and to continue the delineation process.  It then installed vapor intrusion ventilation systems to reduce vapors at multiple locations.  Astbury concluded that, although groundwater was not addressed specifically in the UAO, due to the unconsolidated soil formation and high water table in the area, it would be ineffective to remediate contaminated soils without also remediating groundwater.  EPA approved Astbury's remedial work plan sometime before December 2004.

The different approaches taken by courts in deciding whether environmental clean-up expenses should be considered defense or indemnity costs demonstrate the challenge in trying to predict what Indiana courts would do here.  Ohio Casualty cites *Fairclough* and *Chemical Leaman* to argue that government-mandated investigative costs, such as the expenditures at the Masterwear site, should be allocated to the indemnity provisions of its policies.  See also Eileen B. Eglin & Stephen D. Straus, *Classifying RI/FS Costs Under a Policy of Comprehensive General Liability Insurance: Indemnity or Defense?*, 5 Fordham Envtl. L. J. 385 (1994) (CERCLA's approval criteria and its mandatory nature

operate in favor of classifying costs associated with performing an RI/FS as indemnification rather than defense expenditures).  Ohio Casualty argues that, because all of its costs were incurred after and as a result of EPA's Order, they should count toward the policies' indemnity limits.  While Ohio Casualty agrees that site investigation expenses sometimes may be considered defense costs, it argues that this is only the case when those expenditures can possibly affect the liability of the insured.  It points out that Masterwear and Reed have not contested their liability at the Masterwear site but have irrevocably agreed to comply with the EPA's Order.  Ohio Casualty also points out that the EPA has approved Astbury's work plan for the site.

The defendants argue that *Aerojet*, *Domtar*, and *American Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475, 485-86 (Mich. 1996), demonstrate that any cost reasonable and necessary for either avoiding or minimizing liability should qualify as a defense cost.  They argue that these cases also recognize that the mandatory nature of an expense does not necessarily qualify it as an indemnity cost.  Finally, they argue that to the extent any specific expense in this case is difficult to allocate, it should be considered a defense cost because any ambiguity in the Masterwear policies should be construed against Ohio Casualty.

At this stage, the court need not decide which of the various legal standards should apply in this case.  Even if Indiana courts were to adopt an approach similar to that urged by Ohio Casualty, the court could not conclude as a matter

of law that all of Ohio Casualty's expenses are properly categorized as indemnity expenses. *Fairclough* and *Chemical Leaman* create a presumption in favor of indemnity costs, but the insured and other parties are still entitled to rebut that presumption. The case law suggests that the issue rarely can be decided as a matter of law prior to completion of the clean-up process or without an evidentiary hearing.[5]

Two considerations highlight that point here. First, Indiana courts generally contemplate a thorough review of the facts before allocating insurer costs. In *Employers Ins. of Wausau v. Recticel Foam Corp.*, an insurer appealed a grant of partial summary judgment on claims that it owed a duty to defend and indemnify

---

[5]In its reply brief, Ohio Casualty cites a decision by United States Bankruptcy Judge Anthony J. Metz III when he served as a Judge of the Marion Superior Court. Judge Metz denied a policyholder's motion for partial summary judgment that its technical expert expenses and the costs of its Remedial Investigation/Feasibility Studies ("RI/FS") and Engineering Evaluation/Cost Analysis ("EE/CA") under CERCLA be designated as defense costs. See *Dana Corp. v. Hartford Accident & Indemnity Co.*, No. 49D01 9301 CP0026 (Ind. Super. Aug. 20, 1997), reported in Mealey's Litigation Report, Vol. 11, Issue 42 (Sept. 9, 1997). Judge Metz noted the division in the case law of other jurisdictions on this issue and described the outcomes of the cases as "highly fact-specific." ¶ 259. He concluded that the *Fairclough* and *Aerojet* decisions were more consistent with the mandatory, remedial-directed nature of the RI/FS and EE/CA processes, and he concluded that the insured's costs were presumptively indemnity expenses. However, he declined to decide what evidence would be sufficient to overcome that presumption, noting only that he could not decide as a matter of law that the expenses had been incurred solely as a defensive measure. He therefore denied the insured's motion, but concluded: "At trial, Dana will have the opportunity to prove that specific portions of the RI/FS and EE/CA costs should be allocated to defense." ¶ 265. Judge Metz's decision is persuasive in showing that these issues are not suitable for resolution as a matter of law. As in *Fairclough* and *Chemical Leaman*, the court applied only a presumption in favor of allocating government-mandated clean-up expenses as indemnity costs, with an opportunity for rebuttal evidence.

a policyholder.  716 N.E.2d 1015, 1019 (Ind. App. 1999), transfer denied, 735 N.E.2d 235 (Ind. June 5, 2000).  The policyholder was the subject of legal proceedings associated with its waste handling practices.  The trial court ordered the insurer to pay past defense costs and all future costs in defending against two lawsuits and a notice of violation letter from the state.  716 N.E.2d at 1027.  The insurer agreed to pay a portion of the attorney fees from the two lawsuits but it refused to pay other costs submitted by the insured.  It argued that those expenses were unreasonable or unnecessary and that some consultant fees did not qualify as costs of defense.

The Court of Appeals held that the insured had the burden of establishing the reasonableness and necessity of its defense costs, and that a self-serving affidavit by corporate counsel was insufficient to meet that burden.  716 N.E.2d at 1027.  With respect to the insured's consultant fees, the court stated: "Although we accord the trial court discretion in allocating between defense and indemnification costs, the nature of the expense is a question of fact. . . .  Upon remand, the trial court is instructed to conduct an evidentiary hearing and to make the necessary factual determinations."  *Id.*

Second, allocation of Ohio Casualty's expenses is especially difficult at this stage because, at the time the parties' motions were filed, the discovery deadlines had not yet expired and the clean-up process at the Masterwear site was ongoing. The testimony of Ohio Casualty's claims litigation associate Paula Matheny

suggests that she simply initially designated all non-lawyer costs as indemnity expenses. See Matheny Dep. at 198-202. While the defendants have made efforts to refute that designation, Astbury's invoices provide little detail and Nichols, the project manager at the Masterwear site, was not deposed until mid-2005.

Nevertheless, the defendants have pointed to evidence indicating that at least some of Astbury's activities were undertaken so that Masterwear might avoid or minimize potential liability, as opposed to merely minimize the costs of remediation. For example, Astbury installed three geoprobe soil borings at the site of a former dump to determine whether the City had contributed to contamination at the Masterwear site. Matheny acknowledges that the expenses associated with this activity (at least $3,866) were spent to identify other potentially responsible parties, see Matheny Dep. at 198-201, and Ohio Casualty has agreed to add this amount back into its interpleader sum. As the party seeking to deposit funds with the court and to be dismissed from this litigation, Ohio Casualty has the burden of demonstrating that it has properly allocated its expenses under the indemnity provisions of the Masterwear policies. As this one example illustrates, Ohio Casualty has not shown that all of its expenses can be considered indemnity costs as a matter of law.

On the other hand, the court also cannot decide at this time which specific expenses should be designated as defense costs as a matter of law. There are not enough details to make this determination, and the defendants have focused on

different expenditures and calculated different total amounts.  For example, Pruitt,
Mason, and the Cunninghams argue that the undisputed facts establish that at
least $411,251.02 in costs associated with Astbury's work is properly designated
as defense costs.  Rep. Br. at 25.  In reaching this figure, they have relied on the
affidavit of an environmental attorney who reviewed Astbury's invoices, Nichols'
testimony about those invoices, and other documents produced by Astbury, and
offered his opinion as to which should be treated as defense costs and which as
indemnity costs.  See Van Rheenan Supp. Aff ¶ 6.[6]

The City has focused on the specific task codes provided by Astbury for its
activities.  It argues that at least $595,000 of Ohio Casualty's payments to
Astbury should be designated as defense costs because they relate to groundwater
sampling or other activities undertaken solely to minimize liability.  Resp. Br. at
14.  The City agrees, however, that $455,000 associated with corrective action
implementation and system discharge appears to be for remediation-related

---

[6]The court grants Ohio Casualty's request to strike attorney Van Rheenan's
affidavit.  His affidavit amounts to another lawyer's brief on how to discern and
then apply the proper legal standard under Indiana law for distinguishing between
defense and indemnity costs.  The court does not doubt that Van Rheenan has
helpful knowledge and experience.  Such an opinion on a question of domestic law
invades the role of the court, at least when the issue is one central to the outcome
of the case.  See, *e.g.*, *Bammerlin v. Navistar Internat'l Transp. Corp.*, 30 F.3d 898,
900 (7th Cir. 1994) (district court made "serious error" by allowing expert
testimony on meaning of federal regulation); *Harbor Ins. Co. v. Continental Bank
Corp.*, 922 F.2d 357, 366 (7th Cir. 1990) (district court committed reversible
error by allowing lawyer to testify about results of his legal research on meaning of key
term in insurance policy); cf. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th
Cir. 2006) (no reversible error in allowing lawyer's opinion on non-determinative
issue of law relevant to whether disciplinary action against plaintiff-employee was
justified, where issue was employer's subjective intention).

activities that are properly designated as indemnity costs.  See *id.* at 15-16.  The Cures also argue that the UAO did not require the Reeds to address groundwater and that it required specified removal actions, as opposed to extensive remedial investigations, at the Masterwear site.  See Surr. Br. at 12-14, citing Wanner Aff. and Nichols Dep. at 59.  Their environmental consultant testified that between $488,000 and $588,000 of Astbury's expenses reflect work not required by the UAO and should be designated as defense costs.  Finally, Hoosier Insurance asks the court to compare Astbury's activities with those activities specifically required by the UAO.  It contends that, as an example, any activities related to "subsurface investigation" are not mandatory and therefore those expenses should be considered defense costs.  Resp. Br. at 7.[7]

Despite their discussion of some specific costs or categories of costs, the general focus and strategy of the defendants' briefing has been to oppose Ohio Casualty's approach of designating all Astbury expenditures as indemnity costs.  Whatever the allocation standard ultimately adopted, the court could benefit from

---

[7]Ohio Casualty has moved to strike portions of the City's surreply (Docket No. 319) and the Cures' entire surreply (Docket No. 320).  Both of these motions are denied.  The court earlier granted both parties' motions for leave to file a surreply brief, despite the Cures not having filed a response brief, to respond to new arguments and authorities discussed by Ohio Casualty in its reply brief.  The City was entitled to respond to Ohio Casualty's discussion of Judge Metz's Marion Superior Court decision, introduced for the first time in plaintiff's own reply brief.  Both the City's and the Cures' criticisms of Ohio Casualty's process for allocating payments and Astbury's scope of work are highly relevant to the issues before the court.  The court benefits from a more complete picture of the case in circumstances where, as here, the depositions of key witnesses were not conducted until late in the briefing schedule.

a clearer picture of Astbury's expenditures before deciding the issue.  Accordingly, any motion by defendants that the court designate certain expenses as defense costs is similarly denied.[8]

III.    *Relief*

The Federal Interpleader Act vests jurisdiction in the district court only if the plaintiff actually has deposited the disputed funds (or a bond of the same amount) with the court.  See 28 U.S.C. § 1335(a)(2); *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 798 (7th Cir. 1980).  Because § 1335 is the only jurisdictional basis for this suit, Ohio Casualty must deposit some amount of money with the court to prevent its action from being dismissed.

---

[8]In addition to the expenses associated with Astbury's work at the Masterwear site, the City argues that EPA's response costs and Ohio Casualty's legal fees on behalf of the insureds and the Cures should be considered defense costs.  See Resp. Br. at 16-17.  The Cures also argue for classification of their attorney fees as defense costs.  See Surr. Br. at 1 n.1.  Ohio Casualty contends that these issues are not before the court because they were not part of its motion and because the expenses have not yet been paid.  See Rep. Br. at 29, 33; see also Motion to Strike Cures' Surreply Br. at 2.

Ohio Casualty is correct that it did not address these issues in its motion to deposit, although it did include two line items in its requested deposit amount whose nature is not clear to the court.  Ohio Casualty claims to have spent approximately $2,000 in 1991 for a prior Masterwear claim and approximately $6,000 on behalf of William Cure under the Masterwear policies.  No party has disputed the propriety of the $2,000 expense, but neither has Ohio Casualty pointed to any information about it.  It is not clear whether the $6,000 amount went toward Cure's attorney fees.  In light of these circumstances, the court concludes that allocation of *any* Ohio Casualty expense is premature at this time.

Pruitt, Mason, and the Cunninghams point out correctly that Ohio Casualty must deposit the highest amount for which it might ultimately be held liable. See *United States Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 210-11 (3rd Cir. 1999) (insurer invoking interpleader was required to deposit largest amount for which it may be liable, but this did not include sums that were paid out or contractually committed to settle ongoing, pre-interpleader lawsuits); *CNA Ins. Companies v. Waters*, 926 F.2d 247, 249 n.6 (3rd Cir. 1991) (although deciding the case on other grounds, noting that insurer bringing interpleader action should have paid into court the highest amount for which it ultimately may be liable); *In re Sinking of M/V Ukola*, 806 F.2d 1, 5 (1st Cir. 1986) ("A court may not assert jurisdiction over an interpleader action where the money, property or bond could not suffice to pay the largest amount in controversy."); *National Union Fire Ins. Co. of Pittsburgh v. Ambassador Group, Inc.*, 691 F. Supp. 618, 621 (E.D.N.Y. 1988) (granting motion to dismiss for failure to post sufficient bond because insurer was required to deposit amount claimed against insureds rather than amount it viewed as its maximum liability). The amount in dispute under the three Masterwear policies is the full $1.5 million liability limit. That amount should have been deposited when Ohio Casualty filed its complaint, on December 13, 2004. If Ohio Casualty had done what it should have done, that sum would have been on deposit in a court account, where it would have earned an estimated $79,533 in interest. Accordingly, Ohio Casualty must deposit $1,579,533 no later than Friday, August 18, 2006, if it wishes to maintain this interpleader action.

*Conclusion*

The motion by Pruitt, Mason, and the Cunninghams (Docket No. 227) for partial summary judgment for additional coverage under the three Masterwear policies is denied.  Ohio Casualty's motion to deposit funds (Docket No. 89) is denied in its current form.  Ohio Casualty's motion to strike portions of the City's surreply (Docket No. 319) and its motion to strike the Cures' surreply (Docket No. 320) also are denied.

Ohio Casualty is hereby ordered to deposit the full amount of its Masterwear policy proceeds, plus interest from December 13, 2004 – equal to $1,579,533 – with the court no later than Friday, August 18, 2006, where it will be held in an interest-bearing account.  After depositing this amount, Ohio Casualty may renew its request that it be deemed to have satisfied its duty to indemnify the claimant-defendants for any bodily injury or property damages caused by Masterwear and/or the Reeds stemming from contamination at the Masterwear site and its request to be dismissed from the case with prejudice.

So ordered.

Date: August 11, 2006

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas Andrew Benson
U.S. DEPARTMENT OF JUSTICE - ENVIRONMENTAL ENFORCEMENT
thomas.benson@usdoj.gov

Theodore J. Blanford
HUME SMITH GEDDES GREEN & SIMMONS
tblanford@humesmith.com

Michael E. Brown
KIGHTLINGER & GRAY
mbrown@k-glaw.com

Stephen P. Brown
PLUNKETT & COONEY PC
sbrown@plunkettcooney.com

Charles W. Browning
PLUNKETT & COONEY, P.C.
cbrowning@plunkettcooney.com

Adam A. Carroll
HUME SMITH GEDDES GREEN & SIMMONS
acarroll@humesmith.com

Michael D. Chambers
SOMMER BARNARD ATTORNEYS, PC
mchambers@sommerbarnard.com

Frank J. Deveau
SOMMER BARNARD ATTORNEYS, PC
fdeveau@sommerbarnard.com

Jonathan P. Emenhiser
PLEWS SHADLEY RACHER & BRAUN
jemenhiser@psrb.com

Peter Ralph Foley
FOLEY FOLEY & PEDEN
peterffplaw@insightbb.com

David R. Gillay
BARNES & THORNBURG LLP
david.gillay@btlaw.com

Alan David Greenberg
U.S. DEPARTMENT OF JUSTICE
alan.greenberg@usdoj.gov

Edward S. Griggs
BARNES & THORNBURG LLP
sean.griggs@btlaw.com

Kandi Kilkelly Hidde
BINGHAM MCHALE
khidde@binghammchale.com

Barbara A. Jones
BINGHAM MCHALE, LLP
bjones@binghammchale.com

Timothy J. Junk
INDIANA STATE ATTORNEY GENERAL
tjunk@atg.state.in.us

Bruce L. Kamplain
NORRIS CHOPLIN & SCHROEDER LLP
bkamplain@ncs-law.com

Michelle H. Kazmierczak
KIGHTLINGER & GRAY
mkazmierczak@k-glaw.com

Ginny L. Peterson
KIGHTLINGER & GRAY
gpeterson@k-glaw.com

George M. Plews
PLEWS SHADLEY RACHER & BRAUN
gplews@psrb.com

Peter M. Racher
PLEWS SHADLEY RACHER & BRAUN
pracher@psrb.com

James A. Reed
P.O. Box 17555
Indianapolis, IN 46217

Linda Lou Mull Reed
P.O. Box 17555

Indianapolis, IN 46217

Jana K. Strain
PRICE WAICUKAUSKI RILEY & DEBROTA
jstrain@price-law.com

Brad R. Sugarman
SOMMER BARNARD ATTORNEYS, PC
bsugarman@sommerbarnard.com

Karen E. Torrent
UNITED STATES DEPARTMENT OF JUSTICE
karen.torrent@usdoj.gov

William C. Wagner
SOMMER BARNARD ATTORNEYS, PC
wwagner@sommerbarnard.com

Ronald J. Waicukauski
PRICE WAICUKAUSKI RILEY & DEBROTA
rwaicukauski@price-law.com

Jill E. Zengler
UNITED STATES ATTORNEY'S OFFICE
jill.zengler@usdoj.gov